## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>LAMAR ALEXANDER | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>07-  **07 - 1 5 0 7 M** |

Complaint for violation of Title 18, United States Code § 473

| NAME OF MAGISTRATE JUDGE<br>HON. PATRICK J. WALSH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>August 24, 2007 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT
SEP 1 2 2007
CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about August 24, 2007, in Los Angeles County, within the Central District of California, defendant LAMAR ALEXANDER, sold, exchanged, transferred, and delivered counterfeit obligations and securities of the United States, namely, approximately $10,100.00 in counterfeit one-hundred dollar ($100.00) Federal Reserve Notes, knowing that the money was counterfeit, and with the intent that such counterfeit money be passed, published and used as true and genuine.

LODGED
2007 SEP 12  AM
CLERK U.S. DISTRICT CO
CENTRAL DISTRICT OF
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>JOHN C. JARRARD, III |
|---|---|
| | OFFICIAL TITLE<br>Special Agent - USSS |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>Patrick J. Walsh | DATE<br>September 12, 2007 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: Rasha Gerges::as        REC: Detention

A F F I D A V I T

I, John C. Jarrard, being duly sworn, hereby depose and state:

**BACKGROUND**

1.    I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and have been so employed since November 2001. I am currently assigned to the Los Angeles Field Office, Counterfeit Squad, where I investigate violations of federal law relating to counterfeit United States currency.  I have had formal training relating to the identification of counterfeit United States currency, and the method and modus operandi of manufacturers and distributors of counterfeit currency.  During the performance of my duties, I routinely distinguish counterfeit currency from genuine currency and investigate cases involving the manufacture and distribution of counterfeit currency.

**PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of an arrest warrant and a criminal complaint charging LAMAR ALEXANDER ("ALEXANDER") with a violation of Title 18, United States Code, Section 473 (Dealing in Counterfeit Obligations or Securities).

3.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.  This affidavit is made for the sole purpose of establishing probable cause for the requested arrest warrant and

complaint and does not purport to set forth all of my knowledge of or investigation into this matter.

**PROBABLE CAUSE**

4.    On or about August 10, 2007, I, along with eleven other Special Agents ("SA") of the USSS, participated in an arrest of a suspect for a violation of Title 18, United States Code, Section 473 (Dealing in Counterfeit Obligations or Securities).  The other SAs and I arrested the suspect after we observed him provide over $5,000 in counterfeit United States currency to a confidential informant in a controlled transaction. The arrested suspect subsequently agreed to act as a confidential informant ("CI") in the furtherance of this investigation.

5.    I have reviewed a rap sheet of the CI's criminal history, which indicates that in 1991, the CI was convicted of possession of cocaine in California state court and was sentenced to probation.  The CI has also told me that in 1992, he/she was convicted in federal court in Spokane, Washington, of possession of cocaine with intent to distribute and carrying a firearm during a drug trafficking crime, for which he/she served 14 years in prison.

6.    On or about August 10, 2007, I spoke with USSS SAs Patrick James and Jay Huang and learned the following:

   a.    SAs James and Huang interviewed the CI at the Los Angeles Field Office regarding the counterfeit United States

currency that the CI provided during the controlled transaction. SA James advised the CI, both orally and in writing, of the CI's Miranda warnings via Secret Service Form 1737B ("SSF 1737B"). The CI signed SSF 1737B, indicating that the CI understood the CI's rights and wished to speak to SAs James and Huang without an attorney present.  During the interview, the CI made the following statements, among others:

       i.    Approximately three months ago, the CI was introduced to an individual the CI knew only as "Al" (later identified as ALEXANDER).  During the ensuing three months, the CI obtained approximately $50,000 to $80,000 in counterfeit United States currency over the course of twelve to fifteen transactions from Al or Al's associate, whom the CI knew only as "Nephew" (a man who was later identified as Darrell Smith, hereinafter "Smith").  About one-half of these transactions took place at a specific residence on Western Avenue in Los Angeles, California ("the Western Avenue residence").[1]  The other transactions took place at various other non-residential locations in the Los Angeles, California, area.

      ii.    During these transactions, the CI either paid Al or Nephew for the counterfeit United States currency at the price of $25 in genuine currency for every $100 in counterfeit

---

    [1] On August 20, 2007, I obtained a search warrant for the Western Avenue residence, which was executed on August 25, 2007.

3

currency, or was "fronted" the counterfeit United States currency. (Based on my training and experience, the term "fronted" refers to obtaining counterfeit United States currency at no cost with the understanding that payment will be made at a later date).

iii. After being fronted the counterfeit United States currency, the CI either sold it to numerous unidentified parties or used it to purchase items for the purpose of obtaining change in genuine United States currency.

iv. The CI completed a voluntary written statement in which the CI reiterated the above-mentioned facts.

v. The CI agreed to cooperate further in this investigation and waived his right, in writing, to an initial appearance before a magistrate judge. The CI was released from custody at that time.

7. On or about August 13, 2007, I spoke with SA James, who told me that the CI had called SA James that day, and told him that the address where the CI received counterfeit United States currency from Al and Nephew was the Western Avenue residence.

8. On or about August 17, 2007, I met the CI at the USSS Los Angeles Field Office. During my meeting with the CI, the following events took place:

a. The CI, at my direction, made a consensually-monitored and recorded telephone call to ALEXANDER to arrange for

the sale of counterfeit United States currency.

　　　b.　　I listened to a tape recording of the CI's telephone call with ALEXANDER and heard ALEXANDER tell the CI to call "Nephew" to determine the time and location of the transaction.

　　　c.　　The CI, at my direction, then placed a consensually-monitored and recorded telephone call to "Nephew" (Smith).

　　　d.　　I listened to a tape recording of the CI's telephone call with Smith and heard Smith tell the CI to come to the Western Avenue residence to purchase the counterfeit United States currency.

　　　e.　　USSS SA Brandon Crane and I searched the CI and the CI's vehicle before the CI departed the Los Angeles Field Office to conduct the transaction with Smith.  Neither SA Crane nor I found any counterfeit United States currency, genuine United States currency, or any other contraband during this search.

　　　f.　　SA Crane and I gave the CI $500 in genuine United States currency and instructed the CI to purchase $2,000 in counterfeit United States currency.  SA Crane and I also gave the CI a recording device to use during the transaction.

　　　9.　　On or about August 17, 2007, SA Crane and I followed the CI from the Los Angeles Field Office to the Western Avenue

residence.  SA Crane and I observed the CI the entire time during the CI's drive to the Western Avenue residence.  When the CI arrived at the Western Avenue residence, I was present for the surveillance of the CI's activities.  I also heard the following contemporaneous statements regarding the surveillance as made by SA Peter Vogl over the radio:

      a.  USSS SAs Peter Vogl, Mark McEachern, and Nicholas Olszewski observed the CI get out of the CI's vehicle and briefly meet with an unknown male in the front yard of the Western Avenue residence.

      b.  SAs Vogl, McEachern, and Olszewski then observed the CI go into the Western Avenue residence through the south side entrance.  The CI was inside the Western Avenue residence for approximately five to ten minutes.

      c.  SAs Vogl, McEachern, and Olszewski observed the CI leave the Western Avenue residence and get into the CI's vehicle.

    10.  On or about August 17, 2007, after the CI got into his/her vehicle, SA Crane and I observed the CI drive northbound on S. Western Avenue, away from the Western Avenue residence.  SA Crane and I then followed the CI from the Western Avenue residence to a prearranged debriefing location.  At the meeting location, the following took place:

      a.  The CI gave SA Crane and me $2,000 in counterfeit United States currency that the CI had purchased from Smith at

the Western Avenue residence.

      b.   The CI told me that on the CI's way to the debriefing location, ALEXANDER had called the CI on the telephone and told the CI that ALEXANDER would be receiving a large shipment of counterfeit United States currency on August 19, 2007.

      11.   On or about August 19, 2007, the CI, at my direction, made a consensually-monitored and recorded telephone call to ALEXANDER.  On that same date, I listened to a tape recording of that telephone call and heard the following:

      a.   The CI asked if ALEXANDER would be able to sell the CI a large quantity of counterfeit United States currency.

      b.   ALEXANDER stated he would be unable to provide the counterfeit United States currency that day, but that the following day (August 20, 2007) should be a "sure shot."

      12.   SA James advised me that between August 20, 2007 and August 24, 2007, he spoke with the CI and learned the following:

      a.   The CI told SA James that between August 20, 2007 and August 22, 2007, he/she made several unmonitored and unrecorded telephone calls to ALEXANDER regarding the sale of counterfeit United States currency.  The CI advised SA James that each time during those calls, ALEXANDER told the CI that the counterfeit United States currency was not yet available.

      b.   The CI told SA James that on or about the evening

of August 23, 2007, the CI spoke with ALEXANDER and ALEXANDER advised that the counterfeit United States currency was available.  SA James advised the CI to respond to the USSS Los Angeles Field Office on August 24, 2007.

13.  On or about August 24, 2007, I met the CI at the USSS Los Angeles Field Office.  During my meeting with the CI, the following events took place:

a.  The CI, at my direction, made a consensually-monitored and recorded telephone call to ALEXANDER to arrange for the sale of counterfeit United States currency.

b.  I am informed by SA James that he monitored the CI's telephone call with ALEXANDER and heard ALEXANDER and the CI agree to talk later that day.

14.  Later in the afternoon on or about August 24, 2007, SA James and I met the CI in the parking lot of the Lowe's hardware store at 2800 120th Street, Hawthorne, California 90250 ("Lowe's"), where the USSS intended for the transaction to occur.  During my meeting with the CI, the following events took place:

a.  The CI, at my direction, made a consensually-monitored and recorded telephone call to ALEXANDER to arrange for the sale of counterfeit United States currency.

b.  I am informed by SA James that he monitored the CI's telephone call with ALEXANDER and heard ALEXANDER tell the CI that he was at a football game.  The CI told ALEXANDER that

he/she was in the area of the Lowe's on 120th Street in Hawthorne.   ALEXANDER and the CI agreed to speak at around 8:00 p.m. that evening.

15.   Later that evening, at approximately 7:45 p.m. on or about August 24, 2007, SA James and I again met the CI in the Lowe's parking lot.   During our meeting with the CI, the following events took place:

a.   At approximately 8:00 p.m., ALEXANDER called the CI on the CI's cell phone via the two-way radio feature (commonly referred to as "push to talk" or "direct connect").   The call was monitored, but not recorded.   While monitoring the call, I heard ALEXANDER ask the CI how much he wanted (referring to how much counterfeit currency the CI wanted to purchase).   The CI advised ALEXANDER that he wanted 10,000 (referring to $10,000 in counterfeit currency).   ALEXANDER stated he had 8,000 (of counterfeit currency) with him and would need to get the additional 2,000 (of counterfeit currency) and also stated that another person would be bringing it (an associate would deliver the counterfeit currency to the CI).   ALEXANDER and the CI agreed for the associate to meet the CI in the Lowe's parking lot. Based on the call, it was the CI's understanding that he/she should wait in the Lowe's parking lot for ALEXANDER's associate to arrive with the counterfeit money.

b.   I thereafter searched the CI and the CI's vehicle

before the CI conducted the transaction with ALEXANDER's associate.  I did not find any counterfeit United States currency or any other contraband during this search.

      c.   SA James and I gave the CI $2,500 in genuine United States currency and instructed the CI to purchase $10,000 in counterfeit United States currency.  SA James and I also gave the CI a recording device to use during the transaction.  Before giving the $2,500 in genuine currency to the CI, USSS agents made photocopies of the currency.  SA James and I continually observed the CI from the time I searched the CI to the time of the transaction.

      d.   Between 8:00 p.m. and 9:00 p.m., while the CI was waiting for the associate to arrive, the CI received a telephone call.  SA James and I, who were together in another vehicle, monitored the CI's portion of the conversation.  During that conservation, I heard the CI advise the caller of his exact location in the Lowe's parking lot.

      e.   SA James then called the CI and debriefed the CI regarding the above-referenced call.  SA James has informed me that the CI stated that the caller was ALEXANDER's associate and that he had asked the CI for his location.

      f.   At approximately 9:00 p.m. on or about August 24, 2007, Smith arrived at the Lowe's parking lot driving a white Chevrolet van, with California license plate number 7U76346 ("the

van"), and parked next to the CI's vehicle.  Smith was the sole
occupant of the van.  The CI, who was sitting in his/her vehicle,
got out his/her car and got into the front passenger seat of the
van, while Smith remained in the driver's seat.  Smith and the CI
were in the van no more than approximately five minutes.  While
monitoring the transaction, I heard Smith and the CI greet each
other and make other general conversation.  The CI then got out
of the van, gave the pre-arranged arrest signal, and Smith was
arrested as he prepared to drive away.

g.  During a search incident to arrest, USSS SA Mark
McEachern discovered $2,500 in genuine currency in the front
driver's side area of the van.  The $2,500 matched the copies of
currency provided to the CI by the USSS for the transaction.
Moreover, during the search, I discovered a cellular telephone
laying in the driver's seat of the van and it was ringing.  As it
was ringing, I observed in the caller identification area the
word "Al."  (I did not answer the phone.)

h.  While debriefing the CI out of Smith's view, the CI
gave me an envelope containing $10,100 in counterfeit United
States currency that the CI stated he/she received from Smith in
the van in exchange for $2,500 in genuine currency.

16.  Shortly after 10:15 p.m. on or about August 24,
2007, I spoke to SA James who informed me that at approximately
10:15 p.m. on or about August 24, 2007, the CI called and advised

11

him of the following information:

  a. At approximately 10:15 p.m., ALEXANDER called the CI on the CI's cell phone.  The call was not monitored or recorded.

  b. During the call, ALEXANDER asked the CI about the whereabouts of Smith, and the CI -- in an effort to conceal his involvement in Smith's arrest -- told ALEXANDER that Smith never showed up for the prearranged deal.  ALEXANDER and the CI then agreed to meet in the parking lot of a store called "Big Lots," located at 3003 West Manchester Boulevard in Inglewood, California.  Based on the call, it was the CI's understanding that he/she should arrive at the Big Lots' parking lot immediately to wait for ALEXANDER to arrive with the counterfeit money.

  c. The CI advised SA James that the man known as "Al" was in fact named LAMAR ALEXANDER.

  17. At approximately 10:30 p.m. on or about August 24, 2007, SA James and I again met the CI at a pre-determined location.  During our meeting with the CI, the following events took place:

  a. I searched the CI and the CI's vehicle before the CI conducted the transaction with ALEXANDER.  I did not find any counterfeit United States currency or any other contraband during this search.

b.  SA James and I gave the CI $2,500 in genuine United States currency and instructed the CI to purchase $10,000 in counterfeit United States currency.  The $2,500 in genuine currency that we gave to the CI was the same $2,500 used in the transaction with Smith, and the USSS agents had previously made photocopies of that currency.  SA James and I also gave the CI a recording device to use during the transaction.  SA James and I continually observed the CI from the time I searched the CI to the time of the transaction.

c.  SA James and I then followed the CI to the Big Lots parking lot.  While the CI was waiting for ALEXANDER to arrive, the CI received a telephone call.  SA James and I, who were together in another vehicle, monitored the CI's portion of the conversation.  During that conversation, I heard the CI advise the caller of his exact location in the Big Lots' parking lot.  After the call, the CI drove to another location in the Big Lots' parking lot, where a Lexus Sports Utility vehicle, with no license plate, was parked.  The CI then got out of his/her vehicle and got into the front passenger seat of the Lexus Sports Utility vehicle.  ALEXANDER and the CI were in the vehicle no more than approximately five minutes.  While monitoring the transaction, I heard ALEXANDER and the CI make general conversation.  The CI then got out of the vehicle, and gave the pre-arranged arrest signal.  USSS agents attempted to arrest

13

ALEXANDER at that time, however, ALEXANDER fled from the scene before he could be apprehended.

       d.    Shortly thereafter, SA James and I met the CI at a prearranged debriefing location.  During that meeting, the CI gave SA James and me $10,100 in counterfeit United States currency that the CI had purchased from ALEXANDER at the Big Lots' parking lot.

       18.  At approximately 11:15 p.m. that same evening, I met with SA James Bensley.  During our meeting, I observed SA Bensley call ALEXANDER at the same telephone number that the CI had previously called.  The call was not monitored or recorded.  I was able to hear SA Bensley's portion of the conversation.  At the conclusion of the conversation, SA Bensley informed me of the entirety of the conversation as follows:

       a.    An unidentified man answered the phone and said "Hello."  SA Bensley then stated, "Al?"  The unidentified man responded, "Yeah, who's this?"  SA Bensley then identified himself as a Special Agent with the U.S. Secret Service, told ALEXANDER that they needed to talk to him, and urged ALEXANDER to turn himself in.  ALEXANDER stated that he did not know anything.  The conversation lasted approximately two to three minutes.  During that time, ALEXANDER continued to claim that he did not know anything, and then hung up on SA Bensley.

       19.  On or about August 25, 2007, at approximately 12:30

a.m., Supervisory SA Manuel Puentes and SAs James Bensley, Jay Montgomery, Mark McFarland, Brandon Crane, Peter Vogel, Nicolas Olszewski, Patrick James and I went to a residence located on Hillcrest Avenue in Los Angeles, California, which was believed to be ALEXANDER's home. Once we arrived at that location, the following occurred:

a. ALEXANDER's mother, Helen Alexander, came to the front door. SA James informed Mrs. Alexander that we were special agents with the United States Secret Service, and that we were looking for her son, ALEXANDER. SA James asked Mrs. Alexander if ALEXANDER was in the house. Mrs. Alexander then checked the garage, and informed SA James that ALEXANDER was not there. SA James then asked if we could enter the home, and Mrs. Alexander said yes.

b. While some agents did a protective sweep of the house, I was in the main living room area with Mrs. Alexander, SA James, and other agents.

c. Once inside the house, SA James told Mrs. Alexander that she needed to contact her son, ALEXANDER. I observed Mrs. Alexander use the telephone, and leave a telephone message for ALEXANDER informing him that Secret Service agents were at her home looking for him.

d. After Mrs. Alexander left the telephone message for ALEXANDER, SA James asked her for background information for

15

ALEXANDER (including his date of birth and cell phone number), and also the other individual found at the house, who Mrs. Alexander identified as ALEXANDER's daughter. SA James wrote down this information on a piece of paper, while Mrs. Alexander was speaking.

e.   SA James then asked Mrs. Alexander to call ALEXANDER again. Mrs. Alexander called ALEXANDER approximately three times. SA James informed me that he watched Mrs. Alexander dial the telephone, and he compared the number she dialed with the number he had written on the piece of paper, to ensure that she dialed the same number that she had given him earlier. SA James informed me that he did observe Mrs. Alexander dial the same number that she had told him was ALEXANDER's number.

20.   I was later informed by SA James that the telephone number he had received from Mrs. Alexander for ALEXANDER's cell phone matched the telephone number used by the CI to call ALEXANDER.

21.   I was later informed by SA Brandon Crane of the following information:

a.   On or about August 17, 2007, the CI told SA Crane that he had previously attended a pool party thrown by ALEXANDER, which was located at a house on Hillcrest Avenue, in Los Angeles, California.

b.   The CI gave SA Crane a general description of the

16

specific house, and its location on Hillcrest Avenue, however, he did not provide SA Crane with a specific address.

      c.   After obtaining this information from the CI, SA Crane went to Hillcrest Avenue and was able to match the description of the house he received from the CI with a specific house on Hillcrest Avenue.

      d.   The specific residence on Hillcrest Avenue that the agents visited on August 25, 2007 (where Mrs. Alexander lived), was the same house that SA Crane identified from the information he received from the CI.

   22.  At approximately 6:30 a.m. on August 25, 2007, agents of the USSS and I executed the search warrant I had obtained on August 20, 2007, for the Western Avenue residence.  At the Western Avenue residence, I observed a sheet of paper in the front room entitled "House Management," which had a section entitled "Alexander (AL)."  Under the name "Alexander (AL)" was the telephone number "909-xxx-6166", which was typed.  The telephone number "909-xxx-6166" was the same number the CI and SA Bensley had used to call ALEXANDER.  Agents seized various items during the search conducted at the Western Avenue residence, including $300 in counterfeit United States currency, and other miscellaneous documents.  Among the miscellaneous documents seized were mailings directed to "Lamar Alexander" and other documents referencing "Lamar Alexander."

23.  On or about September 11, 2007, SA James informed me of the following:

a.   On or about September 4, 2007, Criminal Research Specialist ("CRS") Glorivee Mendoza-Toledo conducted a search of the telephone number "909-xxx-6166" in a database used by law enforcement to determine the subscriber name of the account. Through this search, CRS Mendoza-Toledo discovered that the subscriber of the telephone is Tracy Alexander.

b.   SA James later spoke to SA Todd Millen who informed him that SA Millen contacted ALEXANDER's probation officer, United States Probation Officer ("USPO") William Carvella, on or about August 27, 2007.  SA Millen learned from USPO Carvella that ALEXANDER married Tracy Alexander in 1999.

**CONCLUSION**

24.  Based on the foregoing, I believe there is probable cause to believe that LAMAR ALEXANDER has committed a violation of Title 18, United States Code, Section 473 (Dealing in Counterfeit Currency.

JOHN C. JARRARD, III
Special Agent
United States Secret Service

Subscribed and sworn to before

me this _12_ day of September, 2007.

UNITED STATES MAGISTRATE JUDGE

18